THE BARNETT LINE OF STEAMERS, plaintiff in error, *vs.* BLACKMAR & CHANDLER, defendants in error.

1. When parties hold themselves out to the public as doing a particular business in a firm name, the law will imply a partnership agreement as to third persons who contract with them in that firm name, whatever may be the real nature of their connection as between themselves.
2. Where a parol contract was made between the plaintiffs and the defendant in August, 1867, by which the former were employed as the agents of the latter for the period of one year from the 1st of the ensuing October, and the salary agreed upon with the view of the necessity imposed upon the plaintiffs by the duties of such agency of employing a clerk, and a clerk was employed and paid by them, such action amounted to a part performance, which would prevent the defendant, on refusing to comply, from setting up the statute of frauds.

Partnership. Statute of frauds. Before Judge JAMES JOHNSON. Muscogee Superior Court. October Term, 1873.

For the facts of this case, see the decision.

PEABOBY & BRANNON, for plaintiffs in error.

H. L. BENNING; BLANDFORD & GARRARD, for defendants.

WARNER, Chief Justice.

This was an action brought by the plaintiffs against the defendants as partners using the firm name of "Barnett Line of Steamers," to recover the sum of $1,500 00, which the plaintiffs allege the defendants were indebted to them for services

rendered as their agents. The defendants filed their plea of the general issue, and also a plea denying the partnership as alleged in plaintiffs' declaration. On the trial of the case, the jury, under the charge of the court, found a verdict for the plaintiffs. The defendants made a motion for a new trial, on the several grounds stated therein, which was overruled by the court, and the defendants excepted. On the trial, both the plaintiffs were examined in their own behalf. The substance of their testimony was, that in August, 1867, A. Barnett and D. Fry desired to employ plaintiffs as agents of the Barnett Line of Steamers. Plaintiffs told them they would have to hire a clerk to assist them, if they acted as agents, and it would cost $2,000 00. Barnett thought they could get a clerk for $1,500 00, and thinking they could, plaintiffs agreed to take $1,500 00; this was to cover the expense of the clerk, the plaintiffs expecting their profit from the custom of the boats, and the business growing out of the agency. Plaintiffs agreed to hire Mr. Dixon as a clerk, based on this contract, for twelve months, commencing October 1, 1867, and agreed to pay him $1,200 00, and sell him his provisions at cost, which was equal to about $300 00. Mr. Dixon understood that he was employed to assist plaintiffs, in case they received the agency. Blackmar went to New York after making the contract with Barnett, and saw Barnett there; he gave witness (Blackmar) some cards to distribute, among which was one shown and read to the jury, of which the following is, in substance, a copy:

"Barnett through line for New York, on the Apalachicola, Chattahoochee and Flint rivers, in connection with Benner, Brown & Pinkney's Florida line, by steam and sail.

"Through bills of lading given for cotton and goods. See rates on back of card. Agents: Benner, Brown & Pinckney, 9 South William street, New York; H. C. Hart, Eufaula, Alabama; Blackmar & Chandler, Columbus, Georgia; B. F. Bruton, Bainbridge, Georgia; Barnett & Company, general agents, Apalachicola, Florida."

On the reverse side was a list of through freight rates. Blackmar did not return to Columbus until the 3d or 4th of October; was in Savannah on the 2d October. Both Blackmar and Chandler testified they had no notice that the agency was discontinued until the publication of the following notice in the Columbus Sun:

" The Barnett Through Line has no agency at this place.

"BARNETT & COMPANY,

"General agents, Apalachicola.

" Columbus, November 2d, 1867."

Plaintiffs at once, upon making the contract, began to distribute cards and circulars for the Barnett Line, and to answer questions, solicit freight, and collect bills for the Barnett Line, and continued to do so until the publication of the notice in the Sun; cannot specify any particular bills collected, nor remember whether any of the boats of the Barnett Line arrived or departed from Columbus, after the 1st of October, until and before the publication of the notice. Blackmar testified that Captain Dan. Fry did not show him any letter from Barnett notifying plaintiffs that their services as agents would not be wanted. Fry did mention to Blackmar that he had a letter from Barnett, and put his hand in his pocket as though to take it out, but said he would wait until Barnett arrived; that he would be ashamed to read it to him. Barnett was not in Columbus at the time; thinks the boats were owned by Barnett, Fry, Markham, Stapler, Bowers, and perhaps others.

Blackmar & Chandler did not discharge Dixon; kept him twelve months, and paid him $1,200 00, and sold him his groceries at costs; did not discharge him because he had been hired for a year. Blackmar & Chandler had been agents for the Barnett Line before the contract, and served without other compensation than the trade of the boats. The cards published in the Sun, in August and October, 1867, referred to such agency before the contract. Dixon was of some value to plaintiffs; can't say how much; his services were not needed, and plaintiffs' business could have been well conducted with-

out him; he was only engaged to do the extra work expected to grow out of the contract. Plaintiffs introduced a card from the Daily Sun, of September 21st, 1867, as follows:

"Barnett's Steam and Sail Dispatch Through Line. Cheapest and best route of shipping from New York, New Orleans, St. Louis, Cincinnati, and western rivers, to Bainbridge, Georgia, (Flint river,) and Columbus, Georgia, (Chattahoochee river.) All freight from western markets should be consigned to agents at New Orleans, who will forward them, free of commission for forwarding. Owing to the fluctuations of freights on the Ohio and Mississippi rivers, shippers will find it to their advantage to consign as above instead of getting specific rates. No charges for receiving or forwarding on goods or cotton consigned to Barnett & Company, at Apalachicola, Florida. Through bills of lading for cotton or merchandize to be shipped to New York or New Orleans, given by the agents at this point, etc.   Agents—      BLACKMAR & CHANDLER,
                                    " Columbus, Georgia.
" BARNETT & COMPANY, General Agents."

Chandler testified, also, as follows: On the day of the appearance in the papers of the notice of discontinuance, plaintiffs addressed a letter in regard to the matter to Messrs. Barnett & Company, agents, and D. Fry, which letter was introduced. In reply to this, Barnett and Abram Fry called on plaintiffs at their office or place of business for the purpose of compromising and to make a new contract, Mr. Barnett giving as a reason for the discontinuance of the agency that two boats belonging to the line were going to be sent to Texas, and that only two would remain, and that the item of $1,500 00 would appear too large on the balance-sheet for plaintiffs' services as agents for the remaining boats, but was willing to make a new contract, and pay plaintiffs $750 00, and continue the agency. As they could perform the duties connected with two boats without assistance, and thinking they could compromise with Mr. Dixon, and preferring making a concession to having litigation, plaintiffs agreed to accept their proposition, provided security was

given for the payment of the $750 00, and the fulfillment of the new contract, and so notified Messrs. Barnett & Company and Fry. Copy of letter attached. They declined giving security, and all connection between them closed. Plaintiffs did everything required of them by the contract, and the violation was not induced by any action of plaintiffs', but by the prospective removal of the two boats to Texas, which was not contemplated until the contract\had been in force some weeks. Captain Stapler, one of the owners, prevented the removal of the boats.

The following is a copy of the letter:

"COLUMBUS, November 2d, 1867.
"MESSRS. BARNETT & COMPANY and D. FRY,
        "*Agents Barnett Line of Steamers.*

"SIRS:—In reply to our written communication this morning, you verbally propose to do what is right, and pay us for our services, or compromise our demands. In a spirit of concession, and with a desire to settle without litigation, we propose that you pay us $750 00 cash, and end our agency. This offer shall in no way militate against our original claim, and your refusal or acceptance of it is asked this day.
        "Respectfully,
                "BLACKMAR & CHANDLER."

Both witnesses testified that the contract was verbal.

On the part of the defendants, A. Barnett testified: Plaintiffs first acted as agents of the Barnett Line in 1866 or 1867; they were grocery merchants; as such agents, they posted the departure of the boats, answered inquiries and collected bills, and anything else necessary to the interest of the line. This was with no compensation, except from an increase of their business from persons having dealings with the boats. About May or June, 1867, he was in Columbus, and, in company with D. Fry, called on plaintiffs, who were then acting as agents, and during a conversation the question of an agency with a salary was discussed. Plaintiffs asked the appointment in case any such agency was established, to com-

mence October 1, 1867, and end October 1, 1868; the agent's duty was to do as much as plaintiffs had done, and as much more as they could. After this conversation, witness went to New York, and returned about October 1, 1867; had no other conversation with plaintiffs before October 1, 1867. Wrote a letter from New York to D. Fry, in September, 1867, and sent it by mail; kept no copy; has not original; the substance was to the effect, that owing to uncertainty in anticipated business for the Barnett Line, it would not authorize the establishing of a salaried agency at Columbus, and this notice was to be given to plaintiffs at once. In October, 1867, when he came to Columbus, had a conversation with plaintiffs, in which they proposed a compromise, which was refused. After the 1st of October, plaintiffs continued to post boats voluntarily, as they had been doing. Before October 1st, the officers of the boats were instructed to withdraw all accounts left in the hands of plaintiffs for collection, and not to transact any business through them. Witness subsequently caused a notice to be published in the *Sun* and *Times* "that the Barnett Line had no agency in Columbus," because said Blackmar & Chandler continued to post boats voluntarily, after being requested to discontinue; and after witness refused to accept the compromise, he learned also that plaintiffs had acted unfriendly to the line, hence his desire that the public should be aware of the fact that there was no agent at Columbus. The cards referred to were published long before October, 1867, and whilst plaintiffs were acting as voluntary agents. None were published after October 1st, 1867.

Daniel Fry testified as follows: The "Barnett, Fry, and Jackson" composed the Barnett Line. In the summer of 1867, Barnett made an arrangement with plaintiffs to act as agents for the Barnett Line in Columbus; the service was to begin October 1st of that year, and last one year. Barnett went to New York after making this arrangement, and wrote witness during the latter part of September in reference to the contract. That letter is lost; received the letter the latter part of September, 1867, and was in Columbus at the time; showed it

to Captain Klink, and as soon as he had read it, took it immediately to plaintiffs' store, and handed it to Mr. Blackmar at his desk, and he read it in witness' presence. This was a week or more before October 1st, 1867. The contents of the letter were, in substance, to notify plaintiffs that in consequence of disappointment in his expectations, and the probability that the boats would not pay, the Barnett Line would not need the services of an agent in Columbus, Georgia, as he expected, and the line would not need the services of plaintiffs, and they might consider the arrangement with them at an end. Plaintiffs rendered no service that witness knows of under the contract. Plaintiffs expressed regret that the contract had not been consummated, so they might go on under the same. Had several general conversations with plaintiffs in which they spoke of their disappointment in not getting the contract; does not remember any particular remark made by them.

W. L. Stapler testified as follows: He never was a partner with A. Barnett; he only owned an interest in two boats, to-wit: the *Barnett* and *Fry;* had nothing to do with the other two boats. Each boat ran on its own account, kept separate books and accounts, paidits own bills and was under the control and management of its own officers. Barnett acted as agent for all the boats, because of his controlling interest, and against witness' consent. Barnett owned the *Huntsman,* and much the largest interest in the other three boats. Knew nothing of the contract with plaintiffs until he saw their notice in the paper announcing their agency for the Barnett Line. The first card he saw had only three boats: the *Fry, Barnett* and *Jackson,* and after Barnett bought the *Huntsman,* which was in July or August, 1867, it was added to the card and a new card issued. No boat left Columbus during the month of October, 1867, and but one arrived, to-wit: the *Fry;* the river was too low for any boat to run that month, and in the early part of November. The line was composed of these four boats; they ran in connection with steamers and sail vessels from New York and New Orleans to Apalachicola, and

had an established rate of through freights, and under this each boat collected its own freight; the owners of the four boats ran them together under the name of the Barnett Line of Steamers, charging the same rates of freight. After the contract was made with plaintiffs, Barnett determined to send two of the boats to Texas, and the price of $1,500 00 for the agents was regarded by him as too high for agents for two boats.

Charles A. Klink testified as follows: He was captain of the *Jackson;* she was left near Fort Gaines, and witness came up to Columbus in the latter part of September, 1867; the day he arrived in Columbus he met D. Fry at the corner of Rosette & Lawhon, on Broad street; Fry remarked that he had just received a letter from Barnett, and asked witness to read it, which he did; the letter instructed Fry to notify plaintiffs that their services would not be wanted as agents for the Barnett Line; Fry started across the street with the letter in his hand, and went into the store with the letter in his hand open; this was in September, and before the 1st of October, 1867. Plaintiffs did no service for the Barnett Line of Boats after the 1st of October, nor during said month; no boat left the wharf, or arrived at it, during the month of October, 1867; in fact, none until some time in November; the river was too low for any boat to run. Barnett owned stock in all the boats; Fry owned stock in the *Jackson, Barnett* and *Fry;* Bowers in the *Barnett* and *Fry.* He remained at Columbus some time, superintending the preparation of the *Barnett* and *Fry* for their departure for Texas; some of the owners objected, and took legal steps to prevent it; the boats did not go. Witness' recollection was that Blackmar was in Columbus when Fry went over to show the letter, but after hearing the testimony of Blackmar, his recollection was somewhat shaken. Barnett was agent for the line.

L. E. O'Keefe testified as follows: He was a clerk on the steamer *Barnett* in 1867. Does not remember whether the boat arrived or departed from Columbus from October 1, 1867, to November 3, 1867. Went into the store of plaintiffs, and

after paying them a bill for stores bought for the boat, Mr. Chandler offered to collect the freight bills due the boat; witness said to him, "You know I am instructed not to recognize you as agent, and I do not want to leave the bills with you, as agent, to collect;" Chandler replied that it would make no difference; that he would collect the bills; witness then said, "Very well; I will leave them with you on that understanding." The *Barnett* was owned principally by Barnett, Stapler and D. Fry; the *Huntsman* entirely by Barnett; the *Fry* owned by the same parties as the *Barnett*, and the *Jackson* owned by Barnett and Fry alone. The boats were run as a line, but the account of each boat was kept separate, and the owners of one boat were not at all interested in the profits or losses of the others; the profits and losses of each boat were shared by its owners. The boats did all take freights at the same rates, and formed a through line with lines of railroads and steamships. The clerk of each boat could give a through bill of lading to New York or New Orleans by the boat of which he was clerk, but the clerk of one boat could sign no bill of lading for another; there was no partnership between these boats, and there was nothing in which these boats had a common interest in the profits or losses.

The court, amongst other things, charged the jury: "If plaintiffs entered upon the performance of said contract, and continued to work under said contract until the 2d of November, 1867, and were then discharged by the defendants without just cause, or prevented by them from performing the contract, the law considers this as tantamount to performance, and plaintiffs are entitled to recover the full amount stipulated to be paid for the whole year, with interest from the 1st of October, 1868." To which charge defendants excepted.

The court also charged, "that persons who were joint owners of a boat were *quasi* copartners; that if there were three or four boats running the river for freight, and these boats were owned by different persons in different shares, and if some of the owners held shares in each boat, the owners of

The Barnett Line of Steamers *vs.* Blackmar & Chandler.

each boat were copartners *quo ad hoc.* Further, that if there were four boats, and they were owned by different persons, one or more having a share in each as part owner, and if the owners of these several boats agreed to run them as a line, and that, as a line, each boat should have the right to take freight from a ship at Apalachicola, and to charge therefor and to distribute the freight paid among the owners of the particular boat, then the owners of each and all of said boats became thereby *quasi* copartners." To which charge defendants excepted.

The court also charged : "If the said four boats had a common agent, and if such an agent made the contract alleged and set out, the defendants would be liable for its breach if they were part owners of any of the boats, although no partnership existed between the boats." To which charge defendants excepted.

After the court had charged the jury, and argument had, the jury retired and afterwards came into court and, by their foreman, asked the court whether, in the event the jury found for the plaintiffs, they were bound to find $1,500 00. The court thereupon charged the jury, "that the supreme court had so decided, and they were bound to find $1,500 00, if they believed that was the amount agreed to be paid." To which charge defendants excepted.

There were two questions raised on the argument here. First, whether the evidence in the record is sufficient, under the law, to have authorized the charge of the court as to the defendants being partners, the partnership having been denied by them in their plea. Second, the contract being a parol contract, and not to be performed within a year, whether there was sufficient evidence of part performance to take it out of the statute of frauds.

1. The defendants were engaged in running a line of steamboats on the Chattahoochee river, from Columbus to Apalachicola, under the name of the "Barnett Line of Steamers," Barnett acting as the general agent of the parties engaged in that business. The contract was made with the

plaintiffs by Barnett, as such general agent, in relation to the particular business of running the Barnett Line of Steamers. There can be no doubt, we think, from the evidence in the record, that the defendants had a community of interest in that particular business or adventure, although they may not have had any community of interest in the capital stock employed in it. If the defendants had no community of interest in the boats, but had a community of interest or participation in that particular business or adventure, in which they were engaged, they would be liable as partners to third persons dealing with them in their firm name, in relation to, and on account of, that particular business or adventure. The defendants were engaged in running a line of steamboats on the Chattahoochee river, under the name and style of the "Barnett Line of Steamers," for the purpose of earning and collecting freights for the transportation of goods by that line of steamers, and were entitled to receive the profits of that adventure in which they were engaged.

Whatever may have been the private understanding between the owners of the respective boats composing the Barnett Line of Steamers as between themselves, in relation to the freights carried by the respective boats, could not affect the rights of third persons contracting with them in the name of the firm which was ostensibly running that line of steamers, and receiving freights as the Barnett Line of Steamers. Barnett, as the general agent of the Barnett Line of Steamers, made the contract with the plaintiffs in relation to the particular business in which the defendants were jointly engaged in their firm name, and as to that contract the law will recognize them as partners in that particular business, in relation to which the contract was made, so far as the rights of the plaintiffs are concerned. The law will imply a partnership engagement when parties hold themselves out to the world as doing a particular business in a firm name, as to third persons, who contract with them in that firm name, whatever may be the real nature of their connection as between themselves. Although the charge of the court would have been

technically more accurate if it had said the defendants were partners in that particular business or adventure in which they were engaged, so far as the plaintiffs were concerned, instead of saying they were mere "*quasi* copartners," still the charge, in view of the facts of the case, was substantially correct, and' we find no material error in it which would authorize us to grant a new trial.

2. In relation to the statute of frauds, we are of the opinion that the refusing to perform the contract on the part of the defendants, after the plaintiffs had partly performed their part of it by the employment of Dixon as clerk, would render it such a fraud on the part of the defendants as will take the case out of the provisions of the statute: Code, 1951. After a review of the entire record in this case, we find no error, *technical* or otherwise, which would authorize the granting of a new trial. It is for the interest of the public that there should be an end of litigation, and especially so in this case.

Let the judgment of the court below be affirmed.